FILED'11 JAN 28 16:39USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| HALCYN OLENEC; JOHN B. JONES III; JULIE JONES; THOMAS STARK; TERI STARK; LARRY WHITE; BANDON WOODLANDS COMMUNITY ASSOCIATION, and OREGON COAST ALLIANCE | ) ) ) ) ) | Civil No.   10-6427-HO |
| | ) | ORDER |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| NATIONAL MARINE FISHERIES SERVICE, an agency of the National Oceanic and Atmospheric Administration; BARRY A. THOM, in his official capacity as Acting Regional Administrator; UNITED STATES ARMY CORPS OF ENGINEERS, an agency of the Department of the Army; and ROBERT L. VAN ANTWERP JR., Lt. General in his official capacity as the Chief of Engineers and Commanding General for the Corps; | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs move for an order enjoining the defendants and Oregon Resources Corporation (ORC) from mining chromite bearing black sands in Coos County, Oregon.  [#34].

1 - ORDER

Introduction

Plaintiffs Halcyn Olenec, John B. Jones III, Julie Jones, Thomas Stark, Teri Stark, Larry White, Bandon Woodlands Community Assoc (BWCA) and Oregon Coast Alliance (OCA)[1] bring this action under the Administrative Procedures Act (APA) against defendants National Marine Fisheries Service, Barry Thom, the NMFS regional administrator (collectively NMFS); and the U.S. Army Corps of Engineers and Lt. Gen. Robert Antwerp Jr., Chief of Engineers and Commanding General for the Corps (collectively the Corps), alleging violations of the Endangered Species Act (ESA); the Clean Water Act (CWA) and the National Environmental Policy Act (NEPA). [#1].

Plaintiffs challenge various agency decisions that resulted in Oregon Resources Corporation (ORC) obtaining a permit to operate chromite mines in southern Coos County. [#1]. Plaintiffs allege that ORC's surface mines will impact 7.7 acres of wetlands and 0.6 acres of tributary streams and will entail removing vegetation, filling wetlands, rerouting waterways, removing material with heavy equipment, transporting for processing, dewatering of mine pits and replacing the mine tailings at four sites within the watersheds of two fish-bearing streams. *Id.*. Plaintiffs are particularly concerned about the

---

[1]    Plaintiffs are individuals and organizations comprised of members who live, visit and recreate in the area of the proposed mining operations. [#1-p.3,¶ 5].

presence of hexavalent chromium (Cr6) in the ground water at the mine sites, and the risk that possible Cr6 and sedimentation generated during the mining process will injure fish[2] and wildlife, pollute the watershed and threaten their health and well-being.  [#1-p.3,¶ 5].

Plaintiffs allege that defendants acted arbitrarily and capriciously and failed to comply with their statutory obligations under the Administrative Procedures Act (APA), the Endangered Species Act (ESA), the Clean water Act (CWA), and the National Environmental Policy Act (NEPA).  [#1]. Plaintiffs seek: (1) a declaration that the NMFS' and the Corps' actions were arbitrary and capricious; (2) an order enjoining, setting aside and remanding the permit; and (3) awarding reasonable attorney fees and costs.  [#1-pp.38-40].

Plaintiffs' current Motion for a Temporary Restraining Order and Preliminary Injunction seeks to enjoin the defendants' permit allowing the ORC's proposed chromite mining operations to begin on February 1, 2011.  [#34].  Plaintiffs allege that they will suffer irreparable harm from

> "formation and mobilization of toxic Cr6, putting OC Coho and local residents and their drinking water wells at risk as well as filling wetlands enjoyed by plaintiffs, discharge of sediment and pollution of the watershed and increased traffic noise and conflicts with the local

---

[2]    Plaintiffs are concerned about the possible danger posed to the Oregon Coast Coho Salmon (OC Coho), a threatened species.  [#34-p.2].

residential community."

[#34-p.1].

The federal defendants and the proposed intervenor defendant ORC, argue that plaintiffs have not demonstrated either a likelihood of success or that they (or the OC Coho), will suffer irreparable harm.  [#51; #49].  The defendants contend that: (1) there is extensive, sound information upon which NMFS based its finding that neither the geological conditions at the sites nor the removal of chromite sands favor the formation of increased concentrations of Cr6, [#51-pp.11-18; #49-pp.1, 13-19]; (2) the cumulative impacts of potential, future ORC mining was both too uncertain and too indefinite to evaluate, [#49-pp.19-20, #51-pp. 27-29]; (3) the potential harms of sedimentation were addressed through the permit's requirements for project modifications, on-going water quality monitoring and mitigation measures, [#49-pp.2, 17-19, #51-pp.31-33]; and (4) the balance of the hardships do not favor plaintiffs' untimely challenge of an agency decision made in February and March of 2010, upon which ORC has relied in entering into multi-million dollar contracts including construction of a processing plant in Coos Bay Oregon.  [#49-pp.36-41; #50; #51-pp.34-38].

Historical and Factual Background[3]:

"During the Paleocene and Eocene Epochs, 63 to 36 million
years ago, western Oregon was covered by a shallow sea where
thousands of feet of sediments and volcanic rock accumulated."
Committee Report, *United States Geological Survey* (1969), p.26,
U.S. Govn't Printing Office, Washington. "During the Eocene
time, uplift of the Klamath Mountains and vigorous erosion
caused tremendous quantities of sands and silts to be deposited
in the geosyncline (Diller 1902)." *Id.* at p.27. Coal swamps
developed in the Coos Bay area. *Id.*

"During the Miocene Epoch, from 25 million to 13 million
years ago, general uplift of most of western Oregon continued,
particularly in the present Coast Range, which resulted in an
almost complete withdrawal of the sea." *United States
Geological Survey,* at p.29. "By the beginning of the
Pleistocene, only 1 million years ago, the ocean had receded and
left notable terraces containing black sand along the southern
Oregon coast. The black sand is a concentration of heavy
minerals (magnetite, chromite, zircon, garnet, gold and
platinum)." *United States Geological Survey,* at p.31.

The noted trapper Jedidiah Smith was the first outsider

---

[3]      The facts included (other than outside sources), are
those that appear to be undisputed and are gleaned from the
parties collective briefing on the plaintiffs' Motion for
Preliminary Injunction [#34].

5 - ORDER

with a sizable company to make a land trip from California along the Oregon coast instead of through the Umpqua and Willamette valleys. Emil R. Peterson and Alfred Powers, *A Century of Coos and Curry*, p.11, Binfords & Mort (1952). The party had 300 horses and 18 men. *Id.* The last entry in Jedidiah Smith's journal was made on July 3, 1828, after crossing the Coquille River. *Id.* at pp. 11, 15. After traveling along the ocean shore, the group made camp that night at Whiskey Run, a small creek emptying into the ocean. *Id.* at 15.

Gold was discovered at the mouth of Whiskey Run in the winter of 1852-1853. *Id.* at p.133. The camp established nearby became known as Randolph. *Id.* Historian Stephen Dow Beckham placed the site of Randolph one-quarter mile south of Whiskey Run Creek. Nathan Douthit, *A Guide to Oregon South Coast History,* p.133. In a report on historic sites, Beckham noted that whip saw bits, broken glass, pieces of clay and other debris indicate that Randolph's site was on the bluff about seventy feet above the beach. *Id.*

The beach concentrates[4] were mined with various placer mining sluices and rocker boxes. Peterson and Powers, *A Century*

---

[4]    Mapping of offshore mineral deposits indicate the continued presence of black sand concentrates with, for example, one five mile long and two mile wide patch of black sand approximately one mile northwest of Cape Blanco, containing rich concentrations of heavy minerals - more than 30%.

*of Coos and Curry*, at p.133.  "A terrific storm that lashed the coast in the spring of 1854 obliterated most of the gold-bearing black sands, burying sluice boxes and shafts under dunes of prosaic gray grit."  *Id.*  The town quickly faded away but left its name for the Randolph Trail which ran south from Empire, near the entrance of the Coos River, through to the country now known as Seven Devils.  *Id.*

The most successful beach mining occurred where there were concentrated deposits of black sand containing gold, platinum, and chromite.  Nathan Douthit, *A Guide to Oregon South Coast History,* p.46,(According to a 1977 DOGAMI report:"[t]he better concentrates occur near sea cliffs on beaches where wave action during high tides and storms washes away the lighter minerals and leaves a residual rough concentrate of heavy minerals, pebbles and driftwood.").

Late in the nineteenth century, the search for gold in black sand extended inland from the beach to the beach terraces.  *Id.*  The Pioneer Mine on Cut Creek (between the Coquille River and Whiskey Run), eventually had three tunnels, one of which reached 1,340 feet.  *Id.* at pp.46-47.  The operators of this mine followed a pay streak of black sand about three feet thick that contained traces of gold which, were recovered by sluicing.  *Id.*  Terrace placer mines like the Pioneer and nearby Eagle

Mine, continued to be worked into the twentieth century.[5]  *Id.*

The heavy mineral sands along the southern Oregon coast have accumulated as sediment containing various minerals washed out of the Klamath Mountains through coastal rivers.  [#49-p.11].  Over time, the beaches were uplifted as the tectonic plate underlying the Pacific Ocean pushed under the Oregon coast as part of the same process that created the Coast Range Mountains.  *Id.*  These elevated beach terraces range in elevations from 60 feet up to 1,500 feet above sea level. *United States Geological Survey,* at pp. 29-30.

Chromium was extracted from the beach terrace sands in the 1940's for use during World War II.  The "Chrome Plant" at the entrance to Beaver Hill Road near Highway 42, north of Coquille, was said to contain a large centrifuge that separated sand from chrome.  Patti and Hal Strain, *The Coquille Valley: Vol. 1, Memories - Moccasins to the Moon,* p.662, Myrtle Point Printing, (2009).

ORC was formed in 1990, to explore these southern Oregon beach terraces for areas to profitably mine.  [#49-p.11].  In 1991, ORC obtained exploration rights and permits to drill test holes throughout the Cape Arago district of the southern Oregon

---

[5]    J.S. Diller in 1903, wrote that "nearly all of the gold which has thus far been obtained in the Port Orford quadrangle, has come from placer mines, some of which are along beaches in marine deposits and the rest in river gravels", especially along the South Fork of the Sixes as well as Salmon and Johnson creeks. *Guide to S.Oregon Coast History* at 47.

coast.  *Id.*  Through this exploration, ORC identified several potential mine sites, including the four mine sites[6] that are the subject of this litigation.  *Id.*

These proposed mine sites are on elevated beach terraces found on Weyerhaeuser Company commercial timberlands.  [#49-pp.10-13].  The four proposed mine sites total approximately 160 acres and lie within the Three-mile and Five-mile Creeks watersheds on a 1,818-acre mineral leasehold that ORC acquired from Weyerhaeuser.  *Id.*  The intersecting nearby roads are Beaver Hill and Seven Devils.  The timber on the mine sites has been harvested by Weyerhaeuser at least once and will be harvested again regardless of whether the mining commences as scheduled.  [#49-p.12].

The Three-mile and Five-mile Creeks are not included in the over 6,500 miles of streams that the NMFS has designated as OC Coho critical habitat, both because of their limited salmon habitat and because fish surveys have not detected OC Coho.  [#34-p.3; #49-pp.11-12; #51-pp.4-5].  NMFS determined that the potential upper limits of salmon distribution is about 0.25 miles downstream of proposed temporary stream crossings built for the temporary access roads.  [#51-pp.4-5, Ex.1; AR - CE00008].

---

[6]     The four mine sites that are the subject of this lawsuit are: South Seven Devils; North Seven Devils; West Bohemia and West Section 10; all of which are located about 10 miles southwest of Coos Bay.  [AR -CE00008].

9 - ORDER

ORC proposes to extract chromite, garnet and zircon from the mineral sands in this area. [#49-11]. As noted, these mineral sands were washed out of the Klamath Mountains. *Id.* They have eroded over time into smooth rounded grains. *Id.* The Oregon mineral sands are smoother and therefore superior to other commercially available foundry sands which are blasted from rock faces and mechanically crushed. *Id.* ORC plans to sell the chromite and zircon sands to foundries in the United States and abroad, for use in creating molds to cast metal products. [#49-p.10]. The garnet sands will be marketed to the water-jet cutting industry. *Id.*

The mineral sands located beneath topsoil and lighter beach sand deposits,[7] will be evacuated by ORC earth moving equipment, loaded into dump trucks and transported to the processing plant at Bunker Hill, near Coos Bay, where the approximately 25% of the material containing the chromite, zircon and garnet sand will be separated from the remaining 75% material or tailings. [#49-p.12]. The tailings[8] will be returned to the mine site for use in reclamation. [#49-pp.8-9]. The sites will be mined on a

---

[7]     The topsoil and overburden will be stockpiled separately along the margin of the mine area. [#49-p.12].

[8]     ORC conducted synthetic precipitation leaching and toxicity characteristic leaching procedure tests on actual tailing samples removed from the mine site. These tests confirmed that placing the tailings back in the mine sites would not lead to the formation of Cr6 or adversely affect the ground or surface water quality. [#49-pp.8-9; AR - C096].

10 - ORDER

progressive basis in which mining will begin at one end of a
site and progress toward the other end, with no more than 10
acres exposed for removal at a time.  [#49-p.5].

Reclamation will occur simultaneously as the mineral sand
is removed, and the mined area is back-filled with tailings,
overburden, and topsoil.  *Id.*  Once mining is completed on a
site, it will be graded, seeded and planted with trees.  *Id.*
The smaller mine sites will be completely mined and reclaimed
within a year while the largest site will take approximately
four years to be mined and reclaimed.  [#49-pp.5-6, 11-12].

The Corps received ORC's application for a wetlands fill
permit (under section 440 of the CWA), on May 8, 2008, and
initiated review, which pursuant to NEPA, included sending
notice to and soliciting comments from state and federal
agencies, property owners, Native American tribes, environmental
organizations and interest groups.  [#49-p.13; #51-p.5].  The
Corps received responses from many sources including defendant
NMFS and plaintiff Bandon Woodlands Community Organization
(BWCO).  *Id.*

On July 16, 2008, the Corps requested an ESA consultation
with NMFS and over the following year, NMFS' Roseburg staff
gathered information regarding potential impacts of this
project, including those from Cr6.  *Id.*  BWCO submitted reports
prepared by Dr. Daniel Bain, a geologist, and Gregory Kupillas,
a hydrogeologist, supporting their comments, which were

11 - ORDER

considered by NMFS.   [#34-pp.8-9; #49-pp.13-14; #51-p.5, n.1].

On March 3, 2009, ORC provided the Corps and NMFS an 85-page Biological Assessment and related documents prepared by environmental consultants which concluded that the project would not adversely affect OC coho and advised that the risks associated with Cr6 were minimal and could be managed through monitoring.   [#49-pp. 14-15].   On April 20, 2009, ORC provided additional information including a technical memorandum directly responding to the concerns enunciated by the BWCO submissions including perceived Cr6 and water quality risks as they might be impacted by the proposed mining projects.[9]   [#49-pp.15-16].

NMFS requested independent technical assistance from Bill Mason, a geologist with the Department of Environmental Quality (DEQ).   Mr. Mason's summarized findings in a memorandum dated June 18, 2009, and confirmed that: (1) geological conditions at the mining sites did not favor the formation of Cr6; and (2) any Cr6 generated by the mining would be insignificant given the aquifer's ability to reduce Cr6 to trivalent chromium (Cr3) and recommended (as did Dr. Bain and ORC's expert), that these

_____

[9]     The additional information included findings that other ground-disturbing activities such as excavation of cranberry bogs had not increased concentrations of Cr6; that tests on actual tailing samples had shown the tailings placement at mine sites would not increase the formation of Cr6 or adversely affect the ground or surface water quality and that there was no realistic likelihood that the proposed mining would affect the flow of groundwater to residential wells in the general area.   [#49-p.16].

conclusions be confirmed through long-term monitoring.  [#49-pp.16-17; AR-Ex.C106].

On June 29, 2009, NMFS advised the Corps that based on the information then available, it could not concur in the Corps determination that the project would not adversely impact the listed species and identified additional information it needed to resolve it's remaining questions.  [#51-p.5].

On July 15, 2009, NMFS, the Corps and ORC held a telephone conference which lead to NMFS requesting that ORC provide additional information on the monitoring that ORC intended and what it would do in the event of evidence of contamination. [#49-p.17].  On October 16, 2009, ORC provided the responsive report.  [*Id.;* AR Ex.C117].

On December 14, 2009, the Oregon Department of Geology and Mineral Industries (DOGAMI) issued a Note to Reviewing Agencies clarifying that not only would it require monitoring as part of ORC's mine permit but it would also require suspension of mining if monitoring results indicated increases in parameters harmful to either biota or humans.  [#49-p.18; AR-Ex.C132 at 9].  NMFS staff toured the proposed mining sites on December 15, 2009, to gather additional information and evaluate potential impacts to ESA-listed species.  [#51-p.6].

On February 12, 2010, NMFS issued a detailed letter of concurrence finding the proposed mining and processing operations would not likely adversely affect OC coho and other

13 - ORDER

ESA-listed species.  *Id.*  Subsequently, the Corps, on March 2, 2010, issued a section 404 permit authorizing the ORC project. [*Id.*; AR-CE00008-00167]

The permit authorizes the ORC to "discharge fill or dredged materials in up to 7.7 acres of wetlands and 0.6 acres of tributary stream to surface mine four sites" as well as to temporarily install road crossings in three streams to access one of the mining sites.  [#51-p.6; AR-CE00008]  The permit requires ORC to implement the extensive mitigation plan (attached to the permit), creating 12.4 acres of wetlands in addition to removing temporary fills and restoring tributaries impacted by the mining within three years of its first discharge of dredged or fill materials.  [#51-p.6; AR-CE00010-12].

The Corps also issued an Environmental Assessment (EA) and Statement of Findings describing the project,[10] the comments received and concluded that an issuance of Finding of No Significant Impact (FONSI) was appropriate.  [#34 -pp.8-9; #49-p.19; #51-pp. 6-7].

The EA identified and addressed the alternatives considered by the Corps and its conclusion that the alternatives were either not practicable or no less environmentally damaging than the proposed project and so there were no practicable

---

[10]    Both the authorized project and required mitigation were described in plans and drawings attached to the permit. [#51-p.6; AR-CE00003-203].

alternatives to the four proposed mine sites.  [#34-pp.19-20;
#51-p.7, AR-CE00168-203]

Since the permit was issued on March 4, 2010, ORC has
closed financing for the project, engaged in construction of a
multi-million dollar processing plant in Coos Bay, entered into
contracts with suppliers to provide hauling, transportation, and
other services connected with the project and hired
administrative personnel to manage the project.  [#49-pp.20-21;
#51-pp.34-38].  Thus, ORC has created 75 full-time jobs at its
processing facility and over 185 indirect jobs with a $3.5
million payroll.  [#49-pp.20-21].

### Discussion

**A.  Standards of Review:**

1.  Review under the Administrative Procedure Act:

The Administrative Procedure Act (APA) governs judicial
review of agency actions under the ESA, CWA and NEPA.  5 U.S.C.
§706.  Under the APA, a reviewing court must uphold an agency
decision unless that decision is "arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance with law."
5 U.S.C. §706(2)(A).

The Ninth Circuit *en banc* explained that:

> "[r]eview under the arbitrary and capricious standard is
> narrow and [we do] not substitute [our] judgment for that
> of the agency.  Rather, we will reverse a decision as
> arbitrary and capricious only if the agency relied on
> factors Congress did not intend it to consider, entirely
> failed to consider an important aspect of the problem, or

15 - ORDER

offered an explanation that runs counter to the evidence
before the agency or is so implausible that it could not be
ascribed to a difference of view or the product of agency
expertise."

*Lands Council v. McNair,* 537 F.3d 981, 987 (9th Cir 2008)

(internal quotations and citations omitted).

Thus, if the agency "considered the relevant factors and

articulated a rational connection between the facts found and

the choice made" the court must uphold the agency's action.

*Balt. Gas & Elec Co. v. Natural Res. Def. Council Inc.,* 462 U.S.

87, 105 (1983). Further, the court must be "at its most

deferential" when reviewing scientific judgments and technical

analyses within the agency's expertise. *Balt. Gas & Elec Co.,*

462 U.S. at 103. The court must not act as a scientist "that

instructs the [agency] . . ., chooses among scientific studies .

. ., and orders the agency the explain every scientific

uncertainty." *Lands Council v. McNair,* 537 F.3d 981, 988 (9th

Cir 2008)(*en banc*).

The court should also "conduct a particularly deferential

review of an agency's predictive judgments about areas that are

within the agency's field of discretion and expertise ... as

long as they are reasonable." *Lands Council,* 537 F.3d at 993

(internal quotations and citations omitted). And "[w]hen

specialists express conflicting views, an agency must have

discretion to rely on the reasonable opinions of its own

qualified experts even if, as an original matter, a court might

find contrary views more persuasive.  *Lands Council,* 537 F.3d at 1000 (internal quotations and citations omitted).

    2.   Preliminary Injunction:

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 31 (2008).  To obtain a preliminary injunction, plaintiffs "must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey,* 577 F.3d 1015, 1021 (9th Cir 2009)(*citing Winter,* 555 U.S. at 24-25)).

These factors may be evaluated on a sliding scale, so that a preliminary injunction may be issued when plaintiff demonstrates "serious questions going to the merits" and a "hardship balance of hardships that tips sharply toward the plaintiff . . .assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell,* 622 F.3d 1045, 1049-50 (9th Cir 2010).

**B.**   **Preliminary Injunction:**

    1.   Likelihood of Success on the Merits:

        a.   ESA claim:

17 - ORDER

The ESA provides that each federal agency shall, in consultation with a consulting agency, insure that any proposed agency action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat[11] of such species . . . . ." 16 U.S.C. §1536(a)(2). To comply with this requirement, an agency proposing to take an action must first determine whether its action may affect a listed species. 50 C.F.R. § 402.14(a). In this matter, the Corps determined its action might affect a threatened species (the OC Coho), and so, as required, consulted with NMFS. The two agencies were then tasked with determining whether the proposed agency action is "likely to adversely affect" the species. 50 C.F.R. §402.13(a); see also 50 C.F.R. §402.14(b).

If NMFS concurs that the action is not likely to adversely affect the threatened species then the consultation is concluded, however, if NMFS doesn't concur, a more 'formal' consultation must occur. 50 C.F.R. §402.13(h)(3). NMFS must use the "best scientific and commercial data available" in making it's determination. 16 U.S.C. §1533(b)(1)(A).

In this instance, plaintiffs argue that NMFS's decision ran counter to the evidence demonstrating the presence of Cr6 and

---

[11]    Three-mile and Five-mile Creeks are not included in the OC Coho's designated habitat.

was therefore not based on the best available science. [#34-pp.12-17]. However, this assertion overlooks the extensive evidence in the administrative record underpinning NMFS' determination that existing Cr6 levels were not harmful to the OC Coho, and that increases to unsafe levels as a result of the proposed mining were unlikely given site conditions. It also overlooks the agencies' decision to include in the permit requirements for long-term monitoring and immediate responses should harmful increases be detected

Plaintiffs' assertion that the NMFS ignored or failed to consider contrary evidence regarding the capacity of the aquifer to reduce the Cr6 that might develop and failed to do the testing suggested by the DEQ, is similarly unsupported by the administrative record. [#34-p.16]. As a result of negotiations between the agencies, the DEQ recommendations plaintiffs claim were ignored, are expressly incorporated into the ORC permit. [AR-CE00009; AR- Ecl 2, CE0040-50].

The substantial evidence in the administrative record supports NMFS's determination that the Cr6 levels were not harmful to the OC Coho and that site conditions were likely to prevent harmful Cr6 levels from developing. The agencies' actions are thus entitled to deference as they are reasonable, consistent with the scientific evidence and therefore neither arbitrary nor capricious.

19 - ORDER

b)    NEPA claims:

Plaintiffs assert that the Corps failed to take the requisite "hard look" (via an Environmental Impact Study (EIS)) at the "[h]ighly [u]ncertain and [h]ighly [c]ontroversial effects of Chromite mining on the [e]nvironment."  [#34-pp.18-24].

In determining whether a project "significantly" impacts the environment, NEPA regulations require the agency to consider context and intensity.  40 C.F.R. §1508.27.  Context refers to the area of "the affected region, the affected interests and the locality."  40 C.F.R. § 1508.27(a).  Intensity "refers to the severity of the impact."  40 C.F.R. § 1508.27(b).

NEPA regulations include, *inter alia*, the following factors when evaluating intensity: the degree to which the effects on the quality of the human environment are likely to be highly controversial; the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks and whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  40 C.F.R. §1508.27(b)(4), (5), (7).  However, this does not mean that an EIS is required any time "a federal agency discloses adverse impacts on a species or habitat or acknowledges information favorable to a party that would prefer a different outcome."  *Native Ecosystems Council v. U.S. Forest*

20 - ORDER

*Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005).

Federal agencies are required to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C).  However, while an agency's "hard look" involves the discussion of adverse impacts, such information does not automatically make the project controversial or highly uncertain. *Native Ecosystems Council* , 428 F3d at 1241.  "Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain." *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1240 (9th Cir. 2005).

When specialists express conflicting views an agency's decision to rely on reasonable opinions of its own qualified experts must be accorded deference, so long as the agency decision is reasonable. *Bering Strait Citizens for Resp. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 935, 956-57 (9th Cir. 2008).

Plaintiffs contentions in this matter ignore the historical fact that one of the mine sites was previously mined and that their own expert's recommendations coincide with the monitoring provisions incorporated into the Corp's issued permit.

Where the record reveals that an agency based a FONSI upon

21 - ORDER

relevant and substantial data, the fact that there is evidence supporting a different scientific opinion in the record does not render the agency decision arbitrary and capricious. *Wetlands Action Network v. U.S. Army Corps of Engineers,* 222 F.3d 1105, 1120-21 (9th Cir 2000).  In this instance, the Corps' reliance on the mitigation measures proposed by the DEQ (which they explicitly incorporated into their permit), was reasonable.

Similarly plaintiffs' assertion that the Corps' "decision to defer cumulative impacts analysis" is "flatly inconsistent with NEPA" is inaccurate and not supported by the administrative record.  [#34-p.23].  The potential mining sites to which plaintiff refers are "proposed actions" for which the ORC has not yet developed any meaningful plan or proposal and all of which are financially independent of the proposed project. *Lands Council v. Powell,* 395 F.3d 1019, 1023 (9th Cir. 2005)(for any future projects not yet proposed and remote in time a cumulative effects analysis would be speculative and premature). The time for agency analysis and plaintiffs' comment on those future proposals is therefore when the company seeks permits for exploration or development of future sites located in their Weyerhaeuser leasehold.

Based on the administrative record, I find the Corps' decision not to analyze the cumulative effects of potential future sites as detailed in it's EA, reasonable.  The Corps'

decision to issue a FONSI relying on the various expert studies done, DOGAMI's geologic findings of the Coaledo formation, and incorporating the DEQ monitoring and mitigation measures into their permit, was within its discretion and was neither arbitrary nor capricious.

   c) <u>Clean Water Act (CWA) claims</u>:

  Plaintiffs allege that the Corps issued a permit in which it "improperly discounted identified alternative mine sites from its analysis" because of it's reliance on factors that are outside the plain language of the regulation, namely ORC's debt amortization.  [#34-pp.26-27].

  The Corps may properly exclude alternatives that are not economically viable or within the applicant's purpose. *Sylvester v. U.S.Army Corps of Engineers,* 882 F.2d 407, 409 (9th Cir. 1989).  Indeed it would be illogical for the Corps to ignore the economic purpose for which the applicant sought the permit.

  In rejecting the alternative sites, the Corps noted that ORC had estimated quantities of chromite at various sites and consistent with the project's purpose rejected the alternate sites; only the four proposed sites contain sufficient quantities of proven reserves and would produce a return.  [AR-CE00186; <u>see</u> <u>also</u> *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir 1989)(Corps has a duty to take into

account the objectives of the applicant's project and may
consider such facts as cost to the applicant.].

Because NMFS and the Corps have complied with their
statutory obligations under the ESA, NEPA and the CWA,
plaintiffs have not demonstrated a likelihood of success on the
merits of their claims.

2.    Irreparable harm:

Plaintiffs claim that they will be irreparably harmed "if
ground-disturbing activities associated with the chromite mining
can commence on the identified mining sites." [#34-p.27; #56-
pp.23-29]. Specifically plaintiffs allege that the alleged harm
will include: (1) noise and light pollution; (2) the filling of
wetlands; (3) formation and migration of Cr6 affecting water
quality; (4) activities discharging sediment affecting water
quality; and (5) the federal agencies' alleged failure to
consider environmental impacts that will injure plaintiffs'
"organizational" and "aesthetic, educational, and recreational"
interests. [#34-p.22].

Plaintiffs' specific Cr6 concerns are that: (1) "without
information regarding underlying groundwater flows, installation
of monitoring wells does not ensure protection of residential
wells" and (2) "the monitoring plan do[es] not demonstrate that
any actions taken in response to . . . .results indicating
increasing [Cr6] levels will be effective in halting generation

24 - ORDER

and migration . . . after it has commenced." [#56-p.23]. The
plaintiffs appear to base these concerns on Dr. Bains' report.
[#34-pp.22-23].

However, where an agency action involves high levels of
technical expertise, this court's only task is to determine
whether the agency has considered the relevant factors and
articulated a rational connection between the facts found and
the choices made. *Northwest Ecosystem Alliance v. U.S. Fish and
Wildlife,* 475 F.3d 1136, 1140(9th Cir. 2007). The court may not
substitute its judgment for that of the agency. *Id.*

In this instance, the administrative record reveals that:
(1) the Corps considered the light and noise impact on human
habitation [see e.g., AR-CE00194]; (2) the plaintiffs' harm from
decreased access to the wetlands proposed to be filled is
addressed by the agency limiting the mining to 10 acres at a
time, requiring ORC to restore the site including creation of
wetlands in mitigation of any lost and the public currently
being excluded from the wetlands by perimeter fencing and
signage surrounding the private commercial timber land [*Id.*];
(3) Dr. Bain's report on the possibility of Cr6 formation was
thoroughly considered by the defendants along with other
evidence that the existing levels of Cr6 are unlikely to
increase [AR-CE00188-198]; (4) the potential effects of ground
disturbing activities, truck traffic and dewatering activities

that would discharge sediment and possibly affect plaintiffs'
well water quality were recognized and addressed by the agencies
[*Id.*]; and (5) the agencies did not find a likelihood of harm to
a threatened species for several articulated and substantiated
reasons [#51-pp.32-33, Ex.1].  On the other hand, defendants
have demonstrated significant hardships that permitee ORC and
the local Coos County economy would suffer should the injunction
issue.

I therefore find that plaintiffs have not demonstrated that
issuing their requested injunction would be in the public
interest or that defendants have not adequately addressed the
public's environmental concerns related to the proposed private
mining operation on Weyerhaeuser timberlands.

<u>Conclusion</u>

For the foregoing reasons, plaintiff's Motion for a
Temporary Restraining Order and Preliminary Injunction [#34] is
DENIED.

IT IS SO ORDERED.

DATED this ___28th___ day of January, 2011.


*Michael R. Hogan*

United States District Judge


26 - ORDER