IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| JOHN B. JONES III; JULIE JONES; LARRY WHITE; BANDON WOODLANDS COMMUNITY ASSOCIATION; and OREGON COAST ALLIANCE | ) ) ) ) | Civil No.  10-6427 HO |
| | ) | ORDER |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| NATIONAL MARINE FISHERIES SERVICE, et al; | ) ) | |
| | ) | |
| Defendants, | ) | |
| OREGON RESOURCES CORPORATION | ) | |
| Defendant-Intervenor. | ) ) | |

Plaintiffs move for summary judgment vacating the challenged agency decisions in this matter and enjoining defendants actions. [#85].  Defendants and defendant-intervenor oppose plaintiffs' motion and cross-move for summary judgment. [#91; #94].

ORDER - p.1

## Introduction

Plaintiffs' First Amended Complaint (FAC), brings six claims against defendants under the Administrative Procedures Act (APA), alleging violations of the Endangered Species Act (ESA); the Clean Water Act (CWA) and the National Environmental Policy Act (NEPA) and seeking declaratory and injunctive relief. [#88] Specifically, plaintiffs challenge the National Marine Fisheries Service (NMFS) concurrence with the Army Corps of Engineers' (the Corps) conclusion that 160 acres of Oregon Resources Corporation's (ORC) chromite mining operations[1] near Coos Bay, are not likely to adversely affect the Oregon coast coho salmon (OC coho) which the NMFS in 2008, listed as threatened under the Endangered Species Act (ESA).  [#88-p.1, ¶3; #86-p.3].

Plaintiffs allege that, in issuing a permit for surface mining which involves 7.7 acres of wetlands and 0.6 acres of tributary streams and entails removal of vegetation, filling wetlands, rerouting waterways, open pit run removal of material with heavy equipment, transport for processing, dewatering of mine pits and replacement of mine tailings at four sites within the watersheds of two fish-bearing streams, the Corps and NMFS have violated their statutory duties and acted arbitrarily and capriciously.  [#88-

---

[1]      Plaintiffs contend that this is the first open-pit chromite sands mine operated in the United States.

ORDER - p.2

pp.1-2,¶¶ 3-4]. Of particular concern to plaintiffs is the presence of hexavalent chromium (Cr6) in the ground water at the mine site and plaintiffs' perception that Cr6 and sedimentation which may be generated during the mining process, will injure fish and wildlife, pollute the watershed and threaten plaintiffs' health and well-being.   [#88-p.2,¶ 5].

Plaintiffs' FAC seeks: (1) a declaration that the NMFS has violated the Endangered Species Act (ESA); (2) a declaration that the Corps violated the Clean Water Act (CWA), and National Environmental Policy Act (NEPA); (3) an injunction ordering NMFS to conform with the ESA, prepare an Environmental Impact Statement (EIS), and rescind ORC's Section 404 permit; and (4) an award of reasonable attorney fees and costs.   [#88-pp.1-2,35-36]

The federal defendants and the intervenor-defendant ORC, oppose plaintiffs' motion arguing that the record demonstrates that both the Corps and NMFS reasonably concluded that there are no practicable alternatives, that the risks posed by Cr6 are negligible and the proposed mining is not likely to adversely affect OC coho.   [#92; #95].

### FACTUAL BACKGROUND:

The factual background of ORC's mining project was detailed in this court's previous order.   [#59].   The following summarized

ORDER - p.3

facts are derived from the parties' statements and accompanying admissible evidence, and are either undisputed or framed in the light most favorable to the nonmoving party.

The mining is being conducted in four mine sites (South Seven Devils, North Seven Devils, West Bohemia and West Section 10), located on elevated beach terraces found in Weyerhaeuser Company commercial timberlands within the Three-mile and Five-mile Creeks' watersheds in the Cape Arago area of the southern Oregon coast. [#92-p.3; #86-p.5]. The NMFS has not designated Three-mile and Five-mile Creeks as OC coho critical habitat, both because of their limited salmon habitat and because fish surveys have not detected OC coho in either location. [#86-p.5; #92-p.3; #95-p.3].

ORC will extract chromite, garnet and zircon sand from these sites using standard excavation equipment, removing the overburden and topsoil and then removing the mineral sands. [#92-pp.3-4; #95-p.2]. The sands will be transported to a processing plant in Coos Bay, Oregon where the industrial heavy metals are separated from the other sand using a gravimetric process. *Id.* The remaining sand (tailings) will be returned to the mine site and used for reclamation. [#92-p.4; #95-p.3]. Once mining is completed on a site, the site will be graded, seeded and planted with trees. *Id.* The smaller mine sites will be completely mined and reclaimed

ORDER - p.4

within a year while the largest site will take approximately four
years to be mined and reclaimed.  [#86-p.4; #92-p.4].

DISCUSSION

## 1.    Review under the Administrative Procedure Act:

The Administrative Procedure Act (APA) governs judicial review
of agency actions under the ESA, CWA and NEPA. 5 U.S.C. §706.   In
an APA case, summary judgment is awarded if after reviewing the
administrative record, it is determined that the agency's action
was arbitrary and capricious, an abuse of discretion, not in
accordance with law, or unsupported by substantial evidence in the
record taken as a whole.  *Morongo Band of Mission Indians v. FAA,*
161 F.3d 569, 573 (9th Cir. 1988); 5 U.S.C. §706(2)(A).

A decision is arbitrary and capricious if the agency: (1) has
relied on factors which Congress has not intended it to consider;
(2) entirely failed to consider an important aspect of the problem;
(3) offered an explanation for its decision that runs counter to
the evidence before the agency; or (4) is so implausible that it
could not be ascribed to a difference in view or product of agency
expertise.  *Calif. State Grange v, NFMS,* 620 F.SUPP.2d 1111, 1142
(E.D. Cal. 2008); *United States v. Snoring Relief Labs, Inc.,* 210
F.3d 1081, 1085 (9th Cir. 2000).

Review under this standard is narrow, and the reviewing court
may not substitute its judgment for that of the agency. *Morongo
Band*, 161 F.3d at 573. Whenever scientific experts express
conflicting views, "an agency must have discretion to rely on the
reasonable opinions of its own qualified experts even if, as an
original matter, a court might find contrary views more
persuasive." *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 378
(1989).

A court must be "at its most deferential" when an agency is
"making predictions within its area of expertise." *Baltimore Gas &
Elec. Co. v. Nat. Res. Def. Council,* 462 U.S. 87, 103 (1983). The
court must not act as a scientist "that instructs the [agency] . .
., chooses among scientific studies . . ., and orders the agency
the explain every scientific uncertainty." *Lands Council v.
McNair,* 537 F.3d 981, 988 (9th Cir 2008)(*en banc*).

## 2.   Clean Water Act allegations:

The Clean Water Act (CWA), seeks to "restore and maintain the
chemical, physical, and biological integrity of the Nation's
waters" and prohibits the discharge of pollutants into navigable
waters unless otherwise authorized under the CWA.   33 U.S.C.
§§1251(a) and 1344.   Congress has charged the Corps with regulation
of the discharge of dredged or fill material into navigable waters.

*Resource Investm'ts Inc. v. U.S. Army Corps of Engineers,* 151 F.3d 1162, 1166 (9th Cir. 1998).

Navigable waters are defined by the CWA as "the waters of the United States" and by regulation, encompass wetlands. 33 C.F.R. §323.2(d); 33 C.F.R. §328.3(a),(b). The Corps' regulations define "fill material" as "material placed in waters of the United States where the material has the effect of: (I) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States." 33 C.F.R. §323.2(e).

Section 404 of the CWA prohibits the discharge of "dredged or fill material" into navigable waters without a permit issued by the Corps. 33 C.F.R. §1344. The Corps may issue both individual and general permits. 33 C.F.R. §1344(a),(e). An individual permit will not be issued "if there is a practicable alternative to the proposed discharge which would have less adverse impact." 40 C.F.R. §230.10(a)

Plaintiff's argue that "the Corps erred in carrying out the alternatives analysis . . . ." [#86-p.13]. Plaintiffs contend that as a result, the Corps eliminated otherwise practicable alternatives from its analysis and improperly issued the permit based on intervenor-defendant's financing constraints which require

ORDER - p.7

ORC to pay back their investment debt by June 30, 2013.   [#86-pp.14-15].

Defendant NMFS and intervenor-defendant ORC disagree noting that the administrative record of the Corps' decision contains no mention of ORC's need for profit within a certain time.   [#100-pp.3-4; #101-p.2].   Rather, defendants assert the Corps properly considered whether the alternative mine sites could generate the necessary return to fulfill ORC's overall economic objectives. [*Id.*(citing CEO 179-188)].

As correctly noted by all parties, this court's review is limited to the reasoning upon which the agency relied in making its decision.   *Oregon Natural Desert Assoc v. B.L.M.,* 531 F.3d 1114, 1141 (9th Cir. 2008).   It is not this court's role to attempt to deduce the agency's intent by conjecture based on reading between the lines.   Further, it is well established that the Corps may legitimately consider such facts as cost to the applicant. *Sylvester v. U.S. Army Corps of Engin'rs,* 882 F.2d 407, 409 (9th Cir. 1989)(citing *Friends of the Earth v. Hintz,* 800 F.2d 822, 833-34 (9th Cir, 1986).

The Corp's analysis and permitting procedure was previously detailed in this court's order [#59], and will not be repeated here.   In summary, the Corps issued a permit which authorized the

ORDER - p.8

ORC to "discharge fill or dredged materials in up to 7.7 acres of
wetlands and 0.6 acres of tributary stream to surface mine four
sites;" to temporarily install road crossings in three streams to
access one of the mining sites [AR-CE00008]; to implement the
extensive mitigation plan (attached to the permit), creating 12.4
acres of wetlands in addition to removing temporary fills and
restoring tributaries impacted by the mining within three years of
its first discharge of dredged or fill materials.  [AR-CE00010-12].
Further the Corps' Environmental Assessment (EA) notes that based
on "a review of soils, geography and topography" of the alternate
sites, mining in those sites would have "greater aquatic impacts"
and would "not provide the required amount of chromium necessary to
achieve the [project's] overall purpose."  [AR-CE00186-87].

Because the Corps (and NMFS), considered the relevant factors
and articulated a rational connection between the facts found and
the choices made, they have complied with their statutory
obligations under the CWA.  *Northwest Ecosystem Alliance v. U.S.
Fish and Wildlife 475 F.3d 1136, 1140* (9th Cir. 2007).

### 3. National Environmental Policy Act allegations:

Plaintiffs assert that the Corps failed to take the requisite
"hard look" through an Environmental Impact Study (EIS), at the

ORDER - p.9

"new type of activity with completely unknown effects on the
environment" that this mining enterprise entails. [#97-pp.12-29].

Where the record reveals that an agency based a Finding Of No
Significant Impact (FONSI) upon relevant and substantial data, the
fact that there is evidence supporting a different scientific
opinion in the record does not render the agency decision arbitrary
and capricious. *Wetlands Action Network v. U.S. Army Corps of
Engineers,* 222 F.3d 1105, 1120-21 (9th Cir 2000). When specialists
express conflicting views an agency's decision to rely on
reasonable opinions of its own qualified experts must be accorded
deference, so long as the agency decision is reasonable. *Bering
Strait Citizens for Resp. Dev. v. U.S. Army Corps of Eng'rs*, 524
F.3d 935, 956-57 (9th Cir. 2008).

In determining whether a project "significantly" impacts the
environment, NEPA regulations require the agency to consider
context and intensity[2]. 40 C.F.R. §1508.27. NEPA regulations
include, the following factors when evaluating intensity: the
degree to which the effects on the quality of the human environment
are likely to be highly controversial; the degree to which the

---

[2]     Context refers to the area of "the affected region, the
affected interests and the locality." 40 C.F.R. § 1508.27(a).
Intensity "refers to the severity of the impact." 40 C.F.R. §
1508.27(b).

possible effects on the human environment are highly uncertain or involve unique or unknown risks and whether the action is related to other actions with individually insignificant but cumulatively significant impacts. 40 C.F.R. §1508.27(b)(4), (5), (7).

Federal agencies are required to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(C). This does not mean that an EIS is required any time "a federal agency discloses adverse impacts on a species or habitat or acknowledges information favorable to a party that would prefer a different outcome." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005). "Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005).

Plaintiffs argue that because of the uncertainty of the groundwater flow and the possibility of Cr6 formation increasing as a result of the mining, the Corps erred in relying on monitoring rather than preparing an EIS, to address these uncertainties:

"the well-documented uncertainty in this case or equate with a reasoned application of the uncertainty criterion. The approach of implementing a project without preparing an EIS

ORDER - p.11

and then studying the effects through monitoring has the
process exactly backwards."
[#97-p.20].

Defendants counter that the record shows that the
environmental concerns of which plaintiff complains occurs only *if*
Cr6 is formed *and if* it is not attenuated by site conditions *and if*
there is fracturing in the basal clay so that the Cr6 is
transported to the groundwater *and if* transported, is in quantities
that reach 110 parts per billion. [#101-pp.11-12]. This scenario
defendants assert, is very unlikely given the record which
contains:(1) detailed studies of the hydrogeology of all four mine
sites' underlying bedrock foundation based on more than 600 borings
including a detailed analysis of the surface topography of the
basal clay layer; (2) information that the formation of Cr6 (while
possible)to unsafe levels, is unlikely because both manganese and
chromite are being removed; (3) only inert tailings are returned to
the site for fill where conditions (organic carbon, certain iron
and manganese species) will naturally attenuate any chromite to the
trivalent form; (4) evidence that any Cr6 that might be formed and
transported to groundwater would be well below the 110 parts per
billion level drinking water regulation allows given that the
highest amount of Cr6 confirmed in tests was only 7.8 parts per

billion; and (5) Cr6 formation will be monitored through the DEQ
and DOGAMI compliant plan the Corps set up. [#100; #101].

I find the administrative record reveals that: (1) the Corps
considered the light and noise impact on human habitation [see
e.g., AR-CE00194]; (2) any decreased access to the wetlands
proposed to be filled is addressed by the agency limiting the
mining to 10 acres at a time, requiring ORC to restore the site
including creation of wetlands in mitigation of any lost and the
public currently being excluded from the wetlands by perimeter
fencing and signage surrounding the private commercial timber land
[Id.]; (3) Dr. Bain's report on the possibility of Cr6 formation
was thoroughly considered along with other evidence that the
existing levels of Cr6 are unlikely to increase [AR-CE00188-198];
(4) the potential effects of ground disturbing activities, truck
traffic and dewatering activities that would discharge sediment and
possibly affect plaintiffs' well water quality were recognized and
addressed by the agencies [Id.]; and (5) the agencies did not find
a likelihood of harm to a threatened species for several
articulated and substantiated reasons [#51-pp.32-33, Ex.1].

Where the record reveals that an agency based a FONSI upon
relevant and substantial data, the fact that there is evidence
supporting a different scientific opinion in the record does not

ORDER - p.13

render the agency decision arbitrary and capricious. *Wetlands Action Network v. U.S. Army Corps of Engineers,* 222 F.3d 1105, 1120-21 (9th Cir 2000). Additionally, where an agency action involves high levels of technical expertise, this court's only task is to determine whether the agency has considered the relevant factors and articulated a rational connection between the facts found and the choices made. *Northwest Ecosystem Alliance v. U.S. Fish and Wildlife,* 475 F.3d 1136, 1140(9th Cir. 2007). The court may not substitute its judgment for that of the agency. *Id.*

Based on the administrative record in this matter, I find the Corps' decision not to analyze the cumulative effects of potential future sites as detailed in its EA, is reasonable. The Corps' decision to issue a FONSI relying on the various expert studies done, DOGAMI's geologic findings of the Coaledo formation, and incorporating the DEQ monitoring and mitigation measures into their permit, was within its discretion and was neither arbitrary nor capricious. NMFS and the Corps have therefore complied with their statutory obligations under NEPA.

### 3. **Endangered Species Act (ESA) allegations:**

Federal agencies must insure that agency actions are not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or

ORDER - p.14

adverse modification of critical habitat of such species. *Defenders of Wildlife v. EPA,* 420 F.3d 950, 950-51 (quoting 16 U.S.C. §1536(a)(2)). The parties agree that the OC Coho is listed as a threatened species.

Plaintiffs argue that NMFS's decision violated the ESA because the decision: (1) failed to consider the impact of mining and dewatering on stream flow and ran counter to the evidence about the formation and attenuation of Cr6; (2) failed to establish an environmental baseline against which to consider future impacts of the mining and (3) relied on best management practices that were not tailored to the specific conditions at the project site. [#86-p.35].

Defendant NMFS counters that there is no evidence that the amount of water involved is sufficient to affect flows in the Three-mile and Five-mile creeks and the record shows the amount of dewatering is insignificant when compared to the total amount of water supplying those creeks. [#101-p.20]. Intervenor-defendant adds that plaintiffs' contention is unsupported by the record in which "the Biological Assessment expressly addresses groundwater and makes clear that the amount of groundwater that is collected

ORDER - p.15

and reinfiltrated will be small, due in large measure to the small size of the mine pit." [#100-pp.15-16 and CE01612].

The administrative record supports defendants' assertions that the Biological Assessment (BA) considered these issues and determined that "the amount of groundwater pumped from one location and infiltrated to another will be a very small fraction of the overall water budget for the watersheds." [BA, pp. 2-11, CE01612]. Further, plaintiffs' concerns that water removed from the North Seven Devils site and reapplied at the West Bohemia site will transfer water from Three-mile to Five-mile creek are not supported by the administrative record showing that just as the North Seven Devils site drains into Three-mile Creek so does a large, closer portion of the West Bohemia site. [NMFS AR A001 - p.8].

Plaintiffs assert that the NMFS decision conflicts with the best available science because "defendants are wholly unable to reconcile this best (and only) available scientific evidence [on the rate of Cr6 formation] with their supposed conclusion that hexavalent chromium is unlikely to form at the site." [#86-p.41]. However, I find the NMFS determination that the mining projects will not result in Cr6 formation that will adversely affect OC Coho, is amply supported by the administrative record of site

ORDER - p.16

specific information which documents that existing levels of Cr6 are low and site conditions support natural attenuation of Cr6 formation.

Similarly plaintiffs' allegations that NMFS did not use site specific best management practices in its review of ORC's construction of three temporary stream crossings, are unsupported by the record. The NMFS finding that installing the culverts during periods of no active flow (not completely dry conditions), would adequately protect fish habitat is based on site specific information in the record. *See e.g.,* AR Docs C117, C134, C146, C148, C152, C157, C160-62, C167-70, C173-78 and C180.

Finally, despite noting that this is an informal consultation case, plaintiffs assert that NMFS was required to establish an environmental baseline to use in assessing any changes expected from future activities. This assertion is contrary to the plain language of the regulatory requirements regarding informal consultation. 50 C.F.R. §402.13. It is also contrary to the record demonstrating NMFS' consideration of the baseline concentrations of Cr6, the impact of past mining and timber harvesting activities in the watershed, and the current site habitat conditions observed by site visits by NMFS staff.

ORDER - p.17

This court cannot substitute its judgment for that of the
agency. *Citizens to Preserve Overton Park Inc., v. Volpe,* 401 U.S.
402, 416 (1971). The court's task is simply to ensure the agency
considered the relevant factors and articulated a rational
connection between the facts found and the choices made. *Baltimore
Gas,* 462 U.S at 105.

Based on the foregoing analysis, I find the defendant agencies
actions were not arbitrary, capricious, an abuse of discretion,
contrary to the law or unsupported by substantial evidence in the
record as a whole. Plaintiff's Motion for Summary Judgment is
denied and Intervenor-defendant and federal defendants' Cross
Motions for Summary Judgment are granted.

## Conclusion

For the foregoing reasons, plaintiff's Motion for Summary
Judgment [#85] is DENIED. Intervenor-defendant and federal
defendants' Motions for Summary Judgment [#91; #94] are GRANTED.
IT IS SO ORDERED.

DATED this __27½__ day of September, 2011.

United States District Judge

ORDER - p.18